# UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**BETTY CARBO**

**PLAINTIFF**                                                    CIVIL CASE NO. 1:22cv1246

**V.**

**SHIPPENSBURG UNIVERSITY**

**SHIPPENSBURG UNIVERSITY HEAD START**

**(dba Shippensburg Head Start/Pre-K Counts**

**Program)**

**DEFENDANTS**

FILED
HARRISBURG, PA

AUG 1 0 2022

PER _____
DEPUTY CLERK

## COMPLAINT

## I.    PRELIMINARY STATEMENT

The Plaintiff, Betty Carbo, brings this action against Shippensburg University and Shippensburg University Head Start, for violations of the Americans with Disabilities Act ("ADA") as amended by the ADA Amendments Act ("ADAAA"), 42 U.S.C. §§ 12101 to 12213 (collectively, the "ADA") and The Rehabilitation Act of 1973, 29 U.S.C. § 701 et. Seq.

Defendant[s] hired, Betty Carbo on or about April 17, 2017 as Family Development Specialist and later in that same year promoted her to Family Development Manager. Ms. Carbo worked as the FDM until such time that SUHS terminated Ms. Carbo's employment in December 2020.  During Carbo's tenure at Shippensburg University Head Start, she was an excellent employee as evidenced by her promotion and performance reviews.  Despite Ms. Carbo's many achievements, Defendant[s] refused to provide Ms. Carbo with reasonable accommodations for her disabilities during the COVID-19 pandemic.  SUHS refused to engage in the interactive accommodation process upon Ms. Carbo's request for a reasonable accommodation and they refused to consider Ms. Carbo's request independently of their stated policy to deny leave for all employees during COVID.  SUHS terminated Ms.Carbo's employment as a result of her disability and in retaliation for her requesting a reasonable accommodation.

2

Further, SU/SUHS allowed Ms. Carbo to be subjected to severe and pervasive harassment as a result of her request for accommodation. SU/SUHS discriminated against Ms. Carbo based on her disability and fired Ms. Carbo in retaliation for her request for accommodation for her disability. As a result, Ms. Carbo has suffered significant damages.

## II.    JURISDICTION AND VENUE

1. The Court has jurisdiction under Section 504, 29 U.S.C. §794 et seq. Because all of Plaintiffs claims arise under federal law, This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this is a civil action arising under the ADA and federal laws. This court also has supplemental jurisdiction over Plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

2. Venue lies in this court pursuant to 42 U.S.C. §12117(a) because all of the events that give rise to this Action took place in this district. Further, This court is the proper venue for this case under 28 U.S.C. § 1391, as the plaintiff resides within the middle district of Pennsylvania and the defendants operate their businesses within the middle district.

### III.   PARTIES

3. Betty Carbo is resident of Shippensburg, Franklin County, Pennsylvania and was an employee of SUHS, as defined by the ADA and The Rehabilitation Act. Betty Carbo worked for Shippensburg University Head Start as a Family Development Manager in Shippensburg, PA, from approximately October 2017 through approximately December 2020. She resides at 614 Eric Drive, Carlisle, PA 17257

4. Defendant Shippensburg University (SU), is one of the 14 universities in the Pennsylvania State System of Higher Education (PASSHE), with administrative offices at 1872 Old Main Drive, Shippensburg, PA 17257

5. Shippensburg University Head Start (SUHS) is a program or activity that receives federal funds, and a covered employer under Section 504. 29 U.S.C. §794 (b)(2).

6. Shippensburg University Head Start is operated under the direction of SU and its administration

### IV.   STATUTORY AND REGULATORY BACKGROUND

7. Section 504 makes it illegal for a covered employer to discriminate against a qualified individual on the basis of a disability in regard to employment

4

opportunities and the terms and conditions of employment. 29 U.S.C. §794

(d).

8. The statutory definition of discrimination under the Americans with

Disabilities Act and Section 504 of the Rehabilitation Act includes, among

other things,

"not making reasonable accommodations to the known physical or mental
limitations of an otherwise qualified individual with a disability who is an
applicant or employee, unless such covered entity can demonstrate that
the accommodation would impose an undue hardship on the operation of
the business of such covered entity; or
denying employment opportunities to a job applicant or employee who is
an otherwise qualified individual with a disability, if such denial is based on
the need of such covered entity to make reasonable accommodation to the
physical or mental impairments of the employee or applicant; 42 U.S.C.
§12112 (b)(5)(A)(B) ;


and as to deny employment opportunities to an otherwise qualified job
applicant or employee with a disability based on the need of such covered
entity to make reasonable accommodation to such individual's physical or
mental impairments, under the ADA  29 C.F.R. 1630.9(b);


9.   The term reasonable accommodation is defined

(A) making existing facilities used by employees readily accessible to and
usable by individuals with disabilities; and
(B) job restructuring, part-time or modified work schedules,
reassignment to a vacant position, acquisition or modification of
equipment or devices, appropriate adjustment or modifications of
examinations, training materials or policies, the provision of qualified

5

readers or interpreters, and other similar accommodations for individuals with disabilities. 42 USC 12111 (9)
"Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or ) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position; or Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities. 29 C.F.R. §1630.2 (o)(1)

10. Reasonable accommodation may include but is not limited to:

Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities. 29 C.F.R. §1630.2 (o)(2).

11. When making the determination as to whether telework should be granted as an accommodation, an employer should make such determination: "through a flexible interactive process between the employer and the individual ...This process should include identifying and reviewing all essential job functions... An employer should not deny a request for telework merely because a job requires some contact and coordination with other employees." EEOC Guidance- Work at Home/Telework as a Reasonable Accommodation.

12. While an employer may offer a different accommodation than that

requested by an employee, such an accommodation would only meet their

obligations under the ADAA if such accommodation were effective. (Cite)

13. An undue hardship is defined as: Undue hardship –

an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

(B) Factors to be considered  In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include-

> (i)    the nature and cost of the accommodation needed under this chapter;
>
> (ii)   the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;
>
> (iii)  the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and
>
> (iv)   the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity. 42 USC 12111(10)

> (1) In general. Undue hardship means, with respect to the provision of an accommodation, significant difficulty or expense incurred by a covered entity, when considered in light of the factors set forth in paragraph (p)(2) of this section.
>
> (2) Factors to be considered. In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include:

> (B) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

(C) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

(D) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

(E) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(F) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business. 29 C.F.R. §1630.2 (p)

14. The definition of disability under the ADA and Rehabilitation Act is,

A physical or mental impairment that substantially limits one or more of the major life activities of such individual;
A record of such an impairment; or
Being regarded as having such an impairment as described in paragraph (I) of this section. This means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both "transitory and minor." 29 CFR 1630.2

15. Physical or mental impairment means -

(1) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive,

genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities. 29 CFR 1630.2

16. Major life activities -

(A) In general. Major life activities include, but are not limited to:

Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working; and

The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions. The operation of a major bodily function includes the operation of an individual organ within a body system. 29 CFR 1630.2

17. Substantially limits -

The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of

whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment. 29 CFR 1630.2

18. Under the EEOC's Pandemic Preparedness in the Workplace and the Americans with Disabilities Act, medical conditions that place an employee at higher risk should they contract the pandemic influenza are recognized as a disability.

19. Upon receiving a request for reasonable accommodation from an otherwise qualified person with a disability, the employer must initiate an interactive process designed to identify the precise limitations resulting

from the disability and potential reasonable accommodations that could

overcome those limitations." 29 C.F.R. § 1630.2 (o)(3).

The ADA imposes upon employers a good-faith duty to engage with their
employees in an interactive process to identify a reasonable accommodation,
which is triggered when an employee communicates her disability and desire for
an accommodation, even if the employee fails to identify a specific, reasonable
accommodation; however, an employer will not be liable for failure to engage in
the interactive process if the employee ultimately fails to demonstrate the
existence of a reasonable accommodation that would allow her to perform the
essential functions of the position. Americans with Disabilities Act of 1990 § 101
et seq., 42 U.S.C.A. § 12111 et seq., Taylor v. Phoenixville Area SD, 184 F.3d 296
, (3rd Cir. 1999)

20. An employee's request for reasonable accommodation under the

Americans with Disabilities Act (ADA) requires a great deal of

communication between the employee and employer; both parties bear

responsibility for determining what accommodation is necessary, and a

party that obstructs or delays the interactive process is not acting in good

faith, and a party that fails to communicate, by way of initiation or

response, may also be acting in bad faith. Americans with Disabilities Act of

1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; 29 C.F.R. Part 1630 App., §§

1630.2(o)(3), 1630.9. Taylor v. Phoenixville Area SD, 184 F.3d 296 (3rd Cir.

1999)

21. Once the employer knows of employee's disability and the employee's desire for accommodations, burden is on the employer under the Americans with Disabilities Act (ADA) to request additional information that the employer believes it needs, especially in cases of mental illness. Americans with Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A)

22. To show that an employer failed to participate in the interactive process of finding reasonable accommodations under the Americans with Disabilities Act (ADA), a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Americans with Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A).

23. For purposes of ADA or Rehabilitation Act, a reasonable accommodation is one that is feasible or plausible. Rehabilitation Act of 1973 § 501, 29 U.S.C.A. § 791; Americans with Disabilities Act of 1990 § 101, 42 U.S.C.A. § 12111.

24. In deciding whether a genuine issue of material fact exists regarding the reasonableness of requested accommodation, so as to preclude summary judgment in an employee's disability discrimination case, the plaintiff must first make a facial showing that her proposed accommodation is possible; if the plaintiff satisfies this burden of production, the employer must prove, as an affirmative defense, that the requested accommodations are unreasonable, or would cause undue hardship on the employer. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; Americans with Disabilities Act of 1990, § 102(b)(5)(a), 42 U.S.C.A. § 12112(b)(5)(a).

25. The term "reasonable" has two components in Rehabilitation Act disability accommodation context: (1) efficacious and (2) proportional to costs. Rehabilitation Act of 1973, § 504(d), 29 U.S.C.A. § 794(d).

26. Telework is certainly contemplated as a viable accommodation under Rehabilitation Act or ADA in certain circumstances. Rehabilitation Act of 1973 § 501, 29 U.S.C.A. § 791; Americans with Disabilities Act of 1990 § 101, 42 U.S.C.A. § 12111

27. Section 504 prohibits employers from limiting, segregating, or classifying any employee in a way that adversely affects his or her employment opportunities or status on the basis of disability. Likewise, it forbids

employers from employing standards, criteria, or methods of administration which have the effect of discriminating against such individuals unless they are job-related and consistent with business necessity. 29 C.F.R. §1630.5; §1630.7.

## V. Conditions Precedent- Exhaustion of Administrative Remedies, ADA and PHRA claims

28. On or about, January 26, 2021, Betty Carbo timely filed /charges of disability discrimination and retaliation with the Pennsylvania Human Relations Commission and jointly with the Equal Employment Opportunity Commission (EEOC).

29. On May 17, 2022, the EEOC issued Betty Carbo a Notice of Right to Sue, this notice was received on May 20, 2022. This Complaint has been filed within 90 days of receipt of that notice. Betty Carbo has fully complied with all prerequisites to jurisdiction in this Court under the ADA and PHRA

## VI.   Factual Statement

30. Ms. Carbo (Carbo) began her employment with SUHS on or about April 17, 2017

31. During Ms. Carbo's employment with SUHS, Ms. Linda Butts (Butts) was Carbo's primary direct supervisor

32. During this time, Butts was the Director of SUHS

33. During Carbo's employment with SUHS, Ms. Stacy Ott, was the Assistant Director of SUHS

34. Ms. Nipa Browder was working in the SU HR department during the course of Carbo's requests for accommodation

35. Ms. Stephanie Jirard was the SU Social Equity Director, during Ms. Carbo's requests for accommodation, and had indicated during meetings with faculty that she was the one who decided issues of accommodations.

36. SUHS is operated by Shippensburg University

37. SUHS has administrative offices in the SU Spiritual Center

38. SUHS also has classrooms at numerous K-12 school buildings

39. The SU Foundation owns and operates the SU Spiritual Center

40. Carbo suffers from general anxiety disorder. This disorder impacts Carbo's nervous system and other bodily symptoms

41. Carbo has a blood disorder, Factor V Leiden. This disorder makes her 8-9 times more likely to suffer a blood clot than the general public. This disorder impacts her cardiovascular system and creates a heightened risk

15

for Carbo if she is exposed to viruses that lead to blood clotting, like the COVID-19 Coronavirus.

42. As COVID spread during the Spring of 2020, in March, Shippensburg University (SU) closed their campus and as a result Carbo's work, which is located on the Shippensburg University campus began to be completed via telework.

43. On or about March 13, 2020, Butts the Director of the Shippensburg University Head Start(SUHS) sent out an email, stating that SUHS would follow the school closures and nobody would lose pay during such closures.

44. Later that day, Butts sent a second email, informing staff that they would need to use PTO if they could not report to work the following week due to fear of contracting COVID or a need to stay home with their children.

45. That same day the National Offices of Head Start also sent to all employees a notice of increased flexibility concerning workplaces and schedules during COVID.

46. On or about March 15, 2020, Shippensburg University President, Laurie Carter, informed all University staff who were able to perform their work from home that they would be required to do so.

47. Butts never forwarded this email to any of the Head Start staff.

48. On or about March 18, 2020, Butts sent out a notice that the office building of Head Start had been locked by the University, but that she was still working from the office.

49. Butts suggested that other staff could work in the building if they let her know when they would be coming in for work.

50. Neither the University, nor the University Foundation (owner of the office building) were aware that the office building was being used by Butts or any other Head Start employee at that time,

51. The janitorial services to said building were halted as a result of the University Foundation believing that this University building had been closed under the University COVID orders.

52. On or about March 20,2020, Butts sent out a message that employees of SUHS should stay safe and if they had any concerns with anxiety as a result of the pandemic to reach out to her.

53. On or about March 22, 2020, Butts indicated at that point, that she was not sure when SUHS would return to face-to-face work, but that SUHS would have to show National Head Start that they were getting work done virtually or their funding and everyone's pay could be at risk.

54. This statement from Butts was later proven to be fallacious as the National Head Start had no such requirement in order to maintain funding at that point of the pandemic.

55. From on or about March 2020 through July 2020, Carbo continued to complete all of her key responsibilities, and all essential functions of her job via telework, other than the days she worked in the office due to directives from Butts as described below.

56. On or about April 9, 2020, Carbo sent an email to Ms. Butts asking if she was aware that Governor Wolf had closed all schools for the remainder of the academic year.   This now meant that Shippensburg University campus had been closed (prior) and now the schools where SUHS also operates had been closed.

57. Ms. Butts replied to Carbo that such closures did not apply to SUHS and that instead "that when businesses were up and running again" that they would be back face to face.

58. On or about April 13, 2020, Butts sent out a message to what she described as the core leadership team that she would set up a Zoom meeting (i.e. telework) for our regular management meeting.  She asked managers to be in touch with their staff also via telework means – i.e. Zoom or phone calls.

59. At the same time, Butts informed the "core leadership team" that she would be taking that week off as a "staycation," during the beginning of the heightened recruitment season and the early confusion resulting from COVID.

60. Butts again stated that she expected teachers would remain in the classrooms and that SUHS would not shut down, even though the schools where they operated were closed under the Governor's orders, orders that in fact, included Pre-K and Head Start.

61. Despite Butts' position regarding returning to work, as a result of Governor Wolf's orders and orders from PDE, schools including SUHS were shut down from face to face and office buildings were also ordered closed.

62. Butt's continued to work from the SUHS, University office building without informing the University or the Foundation.

63. On or about April 21, 2020, Ms. Butts sent out an email to office staff informing them that she expected they would return to the office with three people working in the office at any one time, starting May 8, 2020

64. On or about April 21, 2020, Carbo sent an email to Ms. Butts informing her that the Governor's orders included schools.

65. In the April 21, 2020 email, Carbo also informed Butts that there were two new laws that were required to be posted and followed – the Emergency Paid Sick Leave and Families First Coronavirus Relief Act.

66. These laws went into effect on April 1, 2020, but Butts indicated that neither Shippensburg University, nor National Staffing had informed her of these laws and that this was the first she had heard of them.

67. Butts wrote in her email reply that she would post them if required to do so.

68. On or about April 28, 2020, Carbo sent Butts an email explaining that under Pennsylvania Department of Education guidance that the PA school closures did apply to Pre-K and Head Start through the end of the school year. Carbo stated her understanding was the SUHS was ordered closed in terms of face-to-face operations.

69. Carbo, in the same email asked if the SUHS employees were really allowed to be on-campus, as her husband a faculty member was informed that no employees were allowed on campus without special permission.

70. Carbo informed Butts that Carbo wanted to make sure they were not violating any laws.

71. Butts failed to reply to this email

72. On or about May 19, 2020, Butts again sent out an email setting out an office schedule for June 1, 2020.

73. Butts wrote in the email that some members had already started with the schedule.

74. Under this schedule 3 SUHS employees would be in the office each day.

75. Shippensburg University and the SU Foundation were unaware of these office employees working on campus. As a result, janitorial services were not even being provided and SUHS employees were emptying the bathroom trash and doing any cleaning that was being completed.

76. On or about May 29, 2020, Butts sent out an email to all staff indicating that she had asked them all about concerns of returning to face to face work. She indicated that these were forwarded to a "reopening Committee."

   (A) Carbo, despite, SU's argument that she was part of the executive team, was not on the reopening committee, nor was she aware of such committee

   (B) In this email, Butts also stated while COVID could lead to anxiety, that staff should overcome this through "faith and optimism" and

that she appreciated the staff who "have shown their strength in moving forward."

77. On or about June 1, 2020, Butts sent out an email that SUHS would hold their annual management retreat in the Chapel above their offices.

    (A) This meeting would be face to face, but Butts wrote that staff could Zoom in from their offices if they were uncomfortable.

    (B) Carbo replied that she would prefer to do this from her office.

    (C) The retreat was held on or about June 15, 16, and 17, 2020.

        (1) It was impossible to hear those speaking via zoom as they were spread out in a chapel with 20 foot plus ceilings and Carbo was the only who joined in via Zoom.

        (2) As a result, Carbo ended up attending the retreat face to face.

      (ii)    None of the attendees were wearing their masks during this meeting again in direct violation of the current COVID orders from Governor Wolf.

78. On or about June 2, 2020, Butts sent Carbo an email asking Carbo about when SUHS would have their annual selection meeting.

79. Carbo indicated in reply that she was concerned that a number of questions including how many children SUHS would be allowed to be admitted at any one time for the 20-21 academic year needed to be answered before they could select students.

80. Carbo indicated to Butts that based on the calls Carbo had been on with National Head Start (via telework) that SUHS should have all of these questions answered BEFORE engaging in selection.

81. Carbo also informed Butts that National Head Start had informed Carbo that we should have serious discussions about why we should not reopen face-to-face before deciding to move to face-to-face reopening.

82. Carbo also indicated to Butts that she had heard that not everyone in the office was wearing their masks in their offices and in common areas, despite the governor's orders to do so and despite Butts' assurances that all would do so.

    (A) Carbo informed Butts that this made Carbo concerned about returning to the office.

    (B) Butts replied that she understood Carbo's concerns, but that her rules for the office are that you do not have to wear a mask in your

office and that if you talk to me from my office door that you do not

have to wear a mask.

(C) Butts indicated that staff were being diligent in keeping distance and

wiping down equipment.

(D) Butts suggested that Carbo would be safe in the office

(E) However, the reality in the office was that:

      (i)     Many people were not wiping down equipment

      (ii)    Staff were not wearing masks in common areas

      (iii)   There were still no janitorial services for the office.

83. On or about June 3, 2020, Cumberland County (location of Ship U campus)

went to yellow (indicator of midlevel spread of COVID) and only at this

point were workers actually allowed back into office buildings.

(A) At that point, Butts sent out an email indicating she had asked

campus security to have the office building unlocked from 7:30 –

4:00.

(B) Under the Governor's orders at that time, all work that could be

done via telework was to remain as such and this order was

specifically stressed for schools,

(C) Further, the Governor's orders specifically stated that "non-direct educational staff were to remain virtual/distance."

(D) Butts ordering back to face-to-face work was in direct violation of the Governor's orders

84. Shippensburg University Head Start (SUHS) and Carbo's department continued to work via a distance/telework from that point in time until June 23, when Butts required all SUHS employees to go into the office one day per week.

85. Starting on or about June 23, 2020, SUHS staff were rotating days in the office to prevent the spread of COVID.

86. Butts increased the face-to-face work requirement to twice per week by July 27th, with plans to require office employees to return to full face to face work five days per week.

87. On or about July 8, 2020, Butts sent an email to SUHS staff that the program year was ending, and that beginning August 3 and 10th SUHS would be returning back to full time face to face to prepare for the upcoming program that would be face-to-face.

(A) In this email, Butts "encouraged everyone who had serious underlying health conditions and/or concerns about returning to

work to please talk with their health care provider to assess risk and

determine if they must stay home or follow additional precautions."

88. Carbo expressed her concerns about COVID, her anxiety and other

underlying medical conditions to her supervisor, Butts, on July 15, 2020 as

per Butts' instructions of July 8, 2020

(A) Butts replied that she and Carbo would talk on Monday, to look at

possible workspaces, but that she felt it was critical to work face to

face to "communicate" as a team.

(B) Butts took this position despite the fact that Carbo had been

regularly working via telework and as per Carbo's conversations with

other head starts the SUHS family development staff were actually

doing very well in terms of our recruiting. The primary function of

the SUHS family development staff at that point in time.

(C) Carbo and her team had also been communicating very effectively

via telework.

(D) At that time, Carbo was completing all essential functions of her job

by communicating via Zoom and other methods.

(E) Carbo was meeting with her team on a daily basis via these methods,

had addressed any problems as they arose, and even when needed

met with staff and or families face-to-face in safe, masked, socially

distanced environments (outdoors when feasible).

(F) Carbo and her team were completing the SUHS fall enrollment (and

in fact well ahead of other head start programs in the area according

to family development managers at other local area head start

programs)

(G) Ms. Butts was not even in the office or in the area at that point in

time.

(H) Carbo along with her staff were also in touch with area agencies

(again via Zoom) and families via phone and when needed on a

limited basis face to face, outside, socially distanced and wearing

masks.

89. On or about July 17th, Butts sent out an email informing that "each office"

in our office building could decide on their own whether to wear masks, as

long as they were "social distancing."

(A) Employees in these officed worked no more than 2-3 feet from each

other.

(B) This assured that in a small office environment with shared

ventilation during a 100 year pandemic, that there would be SUHS

employees who were not wearing masks, drastically increasing the

risk of contracting COVID for all other employees in the building. A

building that according to the owner (SU Foundation) and SU was

supposedly closed.

90. On or about July 21, Carbo, visited her family physician, Dr. Paladi about her

concerns with working face-to-face in the Spiritual Center under the

circumstances

(A) Dr. Paladi, informed Carbo that her concerns were legitimate

(B) Dr. Paladi stated that Carbo should not be working in an office

environment during the pandemic.

(C) Dr. Paladi ordered a doctor's note to be written based on her

medical opinion.

(D) Dr. Piladi's CMA completed such note

(E) The note indicated Carbo's generalized anxiety disorder along with

other comorbidities, qualifying as disabilities and that as a result of

these disabilities that Carbo should work remotely from home

(F) Carbo submitted this note to Butts on July 22, 2020

(G) Butts replied that she would review the documentation the next day

91. On or about July 24, 2020, Butts informed Carbo that she decided to supply Carbo with a "private office" and to require Carbo to work face to face with the reasoning that Carbo would need to be on site to deal with emergencies.

    (A) In Carbo's three years as Family Development manager with SUHS no such emergency had ever occurred in the past.

    (B) This "office" was not an office, but an observation room, behind a classroom with no ventilation and no window.

    (C) Being in this "office," Carbo would also be sharing common areas with all others in the office building. Common areas that were not being cleaned and where SUHS employees were not wearing masks.

    (D) Being in this office, also meant Carbo would be sharing the air/ventilation with SUHS employees who were not wearing masks,

    (E) Butts did not indicate any willingness to sit down to discuss the essential functions of Carbo's job, whether these could be done via telework or whether part of these could be done via telework (i.e. the process recommended under the EEOC's directive on telework as a reasonable accommodation).

(F) Instead, Butts simply informed Carbo that this would be the way it would be, because we had to "work together on behalf of the program to serve our students..." and for the "morale of the staff..." a specifically delineated unacceptable reason for claiming an undue hardship according to the EEOC guidance on telework.

(G) While Ms. Butts indicated that she did not see how I could do my job via telework, even though I had been doing so, she then sent out an email on July 26, 2020, that she would now be off for a second week during our busiest time, and in this case out of the state until August 5, 2020.

(H) SUHS never engaged in the interactive process as described by the ADA and EEOC, never specifically engaged in the interactive process as described in the EEOC guidance on telework as a reasonable accommodation and never offered any form of accommodation, other than the access to what they described as my own office.

(I) Butts also indicated that SU had denied Carbo's letter from Dr. Paladi's office because it came from the CMA.

92. On or about July 29, 2020, Carbo received an email from Preschool Program Specialist from PA Keys, the statewide organization that has authority over the SUHS Pre-K program.

    (A) Carbo and Fareleman, had exchanged emails about the status of the SUHS enrollment during the pandemic.

    (B) Ms. Fareleman indicated, Carbo and her staff were doing everything they could at that time and they should have no concerns.

    (C) At that point in time Carbo was also in discussions with other area Head Starts to see where SUHS was in comparison to those programs for enrollment and based on these conversations SUHS were in as good of shape or even ahead of other programs, while doing their jobs via telework.

    (D) Telework was never an issue to getting children enrolled, rather confusion about the pandemic, the coming school year and the learning modalities led to families being hesitant to enroll their children.

    (E) Some families at that point in time wanted to make sure their children would be face to face, others wanted virtual/distance, and

there was no clear answer what Fall 2020 would bring in terms of the classrooms.

(F) During this time, Carbo discovered that Butts and Associate SUHS Director, Stacey Ott were not informing families about the virtual/distance options SUHS were required to provide.

(G) On numerous occasions, Carbo had to reach out to families who had been misinformed by others at SUHS to let them know a virtual/distance option would be available.

    (i) By August 6, 2020, Carbo's efforts led to three families who had decided not to enroll in SUHS for 20-21 to re-enroll.

    (ii) Carbo was working via telework at that time

93. On or about July 30, 2020, Carbo sent an email to Butts, informing her that Ms. Stacey Ott, was harassing Carbo

    (A) Butts never took any steps to investigate this harassment

94. On or about August 1, 2020, Carbo sent an email to Butts letting her know that Carbo would not be coming into the office based on her doctor's letter suggesting that Carbo should not work in an office setting and should be working via telework.

95. Carbo also informed Butts, that the SU Human Resources had informed Carbo that they did not and would not have denied such the CMA letter from my doctor's office

96. On or about August 7, 2020, Butts held a staff meeting at the SU Picnic Pavillion.  During this meeting:

   (A) Mabel Koser, an SUHS employee asked Butts what would happen for SUHS employees who had to take care of children whose schools were closed.  Butts replied that they were setting up a fund to help with child care services and that they would have to find child care.

   (B) Carbo raised the point that these workers would indeed qualify for FFCRA leave

   (C) Butts replied that leave was used up while the SUHS staff was working via telework due to the Governor's orders.

   (D) Koser replied that they were working then, not on leave.

   (E) Butts replied that this used up their FFCRA leave

   (F) Butts and Ott said that those who could not find childcare would have to take days without pay.

   (G) Butts and Ott stated that they could not allow anyone to work from home, because it would not be fair to the teachers.

(H) Butts was asked about workers travelling to states where PA required a subsequent quarantine and Butts indicated that it was OK for them to immediately return to work in the Spiritual Center and not to worry about the quarantine

(I) Ott mentioned that she was travelling to her beach house in NC (a quarantine state at the time) and returning to the office as soon as she returned

(J) Ott mentioned that she believed she had COVID while in the office but had not informed anybody

(K) Butts direction for every element of the concerns over COVID 19 was to minimize the pandemic, to violate the Governor's orders, CDC guidance, and even the FFCRA.  Such directives created a heightened risk for all SUHS staff and further heightened Carbo's risk and anxiety.

97. On or about August 13, 2020, Carbo typed up a letter she intended to send to Butts concerning the SUHS violations of COVID-19 safety protocols.

(A) That being forced back into the office was against the Governor's direct orders to continue telework,

(B) SUHS had employees who were not wearing masks in the building including common areas,

(C) SUHS had no janitorial services at the Spiritual Center,

(D) An SUHS employee had refilled the soap dispenser in the restroom with water,

(E) SUHS had no hand towels or disinfectants available.

(F) Rather than sending this letter, Carbo discussed these issues with Butts on the phone.

(G) Carbo also called the SU Foundation, the landlord for the building and they had no idea the building was in use and thus had halted any janitorial services.

(H) Due to Butts' urgency to return all workers to face to face for her own convenience, she had placed us all at great risk and had violated state mandates and basic health codes.

98. On or about August 19, 2020, Butts sent an email that on August 24th ALL telework would end with the exception of school staff, working in schools with closures.

(A) Carbo asked Butts if that pertained to individuals who submitted ADA requests and at that point Butts informed Carbo of the SU form medical certification form.

(B) Butts stated Carbo would have to have that specific form filled out in order to proceed with her accommodation request.

(C) Butts said she said she would have an "independent team" review any request for approval.

99. At this point, Carbo had already submitted her request and had submitted two doctor's notes and her doctor was working on a third note as Carbo had requested her FVL paperwork from her prior doctor's office in Ithaca, New York where she had been diagnosed with FVL be sent to Dr. Paladi's office.

100. Carbo's third doctor's note included all of the information requested on the SU form an informed them that Carbo suffered from a FVL which increased her risk of clotting, a particular concern with COVID-19.

101. Despite this, SU/SUHS continued to demand that Carbo have their specific form completed.

102. On or about August 20, 2020 Carbo sent an email to Lisa Pettit, Shippensburg University HR Director, Chris Wonders and Nicole Hill both

Shippensburg University administrators listed as administrators of the SUHS

program in the SUHS policy manual.

    (A) This email expressed Carbo's concerns about how SUHS was handling

        her ADA request as well as requests of Carbo's co-workers.

    (B) Carbo provided information from JAN and the EEOC about how these

        requests should be handled and how Carbo's request should be

        handled.

    (C) Petit, Wonders, and Hill provided no reply,

103.      On or about August 23, 2020 Carbo informed Butts that she (Carbo)

would continue to follow her doctor's advice to work from home.

    (A) Carbo informed Butts that she was sad it had come to this, that she

        loved her work and expressed that she had completed much more

        work from home than at any other time during her tenure at SUHS.

    (B) Carbo even provided examples of what she had done via telework

    (C) Butts sent Carbo an email the next day with FMLA and ADA forms to

        be filled out,

    (D) Butts sent these same forms certified mail to Carbo's home,

        indicating a sharp change in how she was interacting with Carbo.

104.     On or about August 24, 2020, Carbo sent a follow-up asking for a

reply to see who was in charge of making these decisions.

   (A) Carbo informed Petit, Hill, and Wonders that Carbo's supervisor,

       Butts, was not accepting Carbo's doctor's note,

   (B) and that Butts was violating the Governor's order for telework.

   (C) Ms. Pettit indicated she received Carbo's message and that "they"

       would review the message and confer with the director of SUHS,

       Butts.

105.     On or about August 25, 2020, Carbo had an oral surgery

appointment, Butts was informed of this appointment and knew Carbo

would be unavailable.

   (A) Despite this, Butts, Ott, Ms. Watson and Ms. Koser had decided to

       engage in selection of students for our program on that very day,

       without Carbo

   (B) Selection is one of the processes Carbo led as a the FDS Manager.

106.     On or about August 26, 2020, Carbo informed the teachers of SUHS,

that my staff would not be coming into the classrooms or ride the school

busses as per the Governor's COVID orders.

107.     At this point in time, Carbo felt that she was the only person at SUHS who was taking the pandemic seriously.

(A) SUHS associate director, Ott had made several trips out of state through restricted states and never quarantined upon her return.

(B) Ott had also been in the office at times when she thought she might actually have COVID.

(C) SUHS staff were allowed to decide whether or not to wear mask,

(D) SUHS staff were ordered to work from a building with no janitorial services,

(E) Butts was refusing to follow the FFCRA,

(F) Due to the reckless actions of Ott and Butts, Carbo was in serious and justifiable fear for her life due to her FVL.

(G) This also further heightened Carbo's anxiety and led to mood outbursts, trouble sleeping and a recurrence of a nervous tick in her neck.

108.     On or about August 28, 2020, Carbo's son's middle school decided to move to full virtual.

(A) This made Carbo eligible for and lead to her need to take FFCRA leave while his school was closed.

(B) Carbo immediately sent in her leave, but also made it clear she was still interested in an accommodation at the point when her FFCRA leave would end

109.    On or about September 1, 2020, Carbo received a letter in the mail from Ms. Browder (Shippensburg Human Resources), stating that the SUHS needed additional information from Carbo's medical provider for ADA purposes,

(A) Browder again provided the same form they had already requested that only asks for information that Carbo had already provided.

(B) Ms. Browder sent a second letter informing Carbo that Shippensburg University was not my employer for FFCRA purposes and that they would not take any action of Carbo's FFCRA request.

(C) Carbo replied back sending Ms. Browder information about FVL as well as the EEOC guidance on ADA accommodations.

(D) Browder continued to demand that Carbo provide their specific form.

(E) On or about September 10, 2020, Carbo even sent Ms. Browder her initial bloodwork diagnosing her with FVL

110.    On or about October 8, 2020, Carbo emailed Ms. Browder and Ms.

Pettit, that they had failed to engage in the interactive process to

determine a reasonable accommodation and informed them they had

sufficient information regarding Carbo's disability from Carbo's doctor's

notes as per the ADAA and EEOC guidance.

(A) Carbo requested that SU and SUHS engage in the interactive process

as required under the ADA and in line with the EEOC pandemic and

telework guidance documents.

(B) Carbo asked that in the alternative that her email be marked as the

first step in my appeal of their failure to provide an accommodation

111.    On or about October 14, 2020, SU replied that they still needed

Carbo's doctor to complete their specific form, despite having sufficient

information to understand Carbo's disability and the need for

accommodation. A clear violation of the ADA.

(A) Carbo replied by sending her third doctor's note in case SU did not

have it on file.

(B) Carbo also asked what specific information SU would need from her

doctor, rather than just having them send me the specific form.

Under the ADA, SU and SUHS are required to inform applicants for

an ADA accommodation of the specific additional medical information they need if they require additional documentation to what such an applicant has provided.

(C) SU and SUHS, never informed Carbo of the specific information they needed

(D) Instead, SU/SUHS simply informed me that their specific form was needed, a clear violation of the ADA.

(E) Carbo took this as a denial of her request and October 20, 2020, Carbo sent an email to Ms. Jirard to consider her October 8th email the start of her appeal.

(F) Jirard sent back that she had received it.

112.    Hearing nothing for over a month, on or about November 16, 2020, Carbo sent an email to Ms. Jirard asking the status of her appeal

113.    Forty-seven days after Carbo initiated her appeal to SU Social Equity, Jirard indicated she was receiving counsel from PASSHE.

114.    On or about November 30, 2020, Carbo's FFCRA leave was ending, so she sent another follow-up to Ms. Jirard

115.    On or about December 1, 2020, Carbo sent an email to Ms. Butts indicating her willingness to resume her job duties under even a temporary

accommodation, or even part time, doing what work she deemed could be done from home while they awaited Shippensburg University's decision.

116.   Butts replied that she would be expecting Carbo in the office the next morning at 8 am.

117.   On or about December 2, 2020, Carbo again told Ms. Butts she could not put her life in danger, but she was again willing to work in any manner or any job via telework

118.   Carbo heard nothing back until receiving a letter in the mail dated, December 11, 2020, 72 days after her appeal letter and more than four months after Carbo had first submitted her doctor's letter and request for accommodation.

119.   The letter from Ms. Jirard denied Carbo's appeal based on their conclusion that Carbo's anxiety and FVL did not amount to a covered disabilities under the ADA.

(A) Ms. Jirard cited to 28 CFR Section 35.108 as the definition of a disability and why FVL is not a disability.

(B) However, Ms. Jirard's letter truncated this CFR cutting off the critical language of the ADAA that includes within the definition of a major life activity "The operation of a major bodily function, including

functions of the immune system, special sense organs and skin;
normal cell growth, and digestive, genitourinary, bowel, bladder,
neurological, brain, respiratory, circulatory, cardiovascular,
endocrine, hemic, lymphatic, musculoskeletal, and reproductive
functions."

(C) Further, the CFR cited to by Ms. Jirard does not apply to the
employment setting, but instead applies to offering public services.

(D) Given the vast amount of time Jirard took to reply to Carbo's
requests and the fact that Jirard indicated she was conferring with
PASSHE counsel during this time, the reference to a non-relevant CFR
appears to have been meant to intentionally deceive Carbo and
other PASSHE employees who have requested accommodations.

(E) The reference to this CFR by Jirard and other officials throughout
PASSHE was a pattern and practice of deception towards the
employees of PASSHE in regards to their rights under the ADA and
Rehabilitation Act.

(F) Carbo's doctor's notes had already indicated to SUHS how her
underlying conditions impacted her brain functioning, her ability to
work, her circulatory and cardiovascular system and how these

conditions made Carbo more susceptible to negative health

outcomes during the pandemic as defined by the EEOC pandemic

guidance.

120.    Ms. Jirard also stated that in the alternative, telework created an

undue hardship or was not a reasonable accommodation because it would

result in a "fundamental alteration of the nature of the job function" citing

to 28 CFR 35.130(b)(7).

(A) Again, this CFR does not apply to the employment setting.

(B) Further, Ms. Jirard again, miscited to this CFR.

(C) This CFR actually states:

> A public entity shall make reasonable modifications in policies,
> practices, or procedures when the modifications are necessary to
> avoid discrimination on the basis of disability, unless the public entity
> can demonstrate that making the modifications would
> **fundamentally alter the nature of the service, program, or activity.**
>
> There is no mention of a job function.

(i)    This CFR does not apply to making workplace

accommodations, but instead applies to the supplying of

governmental services to members of the public.

       (ii)     Under the employment provisions of the ADA, altering the job functions is indeed considered part of the reasonable accommodation process.

121.     On or about December 24, 2020, Carbo sent a further request for leave without pay as an accommodation, as per the SUHS policy manual, for leave.

     (A) Butts replied that she was carte blanche denying any requests for leave during the pandemic, another clear violation of the ADA, as each request for accommodation MUST be reviewed independently.

## VII.   Causes of Action

### (A) Claim 1: Failure to Accommodate under the ADA, ADAA, and Rehabilitation Act

122.     The allegations set forth in Paragraphs 1-121 are re-alleged and incorporated by reference herein

123.     Plaintiff alleges that "Defendant failed to accommodate her reasonable requests relating to her health conditions and request for a

brief medical leave of absence." To establish her prima facie case for failure to accommodate, Plaintiff must show that "(1) [s]he was disabled and h[er] employer knew it; (2) [s]he requested an accommodation or assistance; (3) h[er] employer did not make a good faith effort to assist; and (4) [s]he could have been reasonably accommodated." Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246 (3d Cir. 2006).

**Plaintiff, is an individual who had a disability within the meaning of the ADA, Rehabilitation Act**

124.    A heightened risk of serious illness or death from contracting a virus during a pandemic is recognized as a disability under the ADA.

125.    Carbo has medical certification that confirms she suffers from Generalize Anxiety Disorder

126.    Defendant has admitted to Plaintiff's disability of anxiety

127.    As a result of Carbo's anxiety disorder, working in public, poorly ventilated area, with numerous co-workers who refused to mask, during a 100-year pandemic, increased Carbo's anxiety, made it difficult for her to concentrate and work, led to mood changes, and the development of a nervous tick,

128.    Such anxiety made it impossible for Carbo to work during the regular shift, face-to-face, at the Spiritual Center at Shippensburg University, the location of the SUHS, especially under the conditions created by Butts.

129.    Carbo's medical certification, from Dr. Paladi, recommended that Carbo work from home to allow her to overcome her disability to perform the essential functions of her job.

130.    Carbo has medical certification that confirms she suffers from Factor-Five Leiden,

131.    Factor-five Leiden is a life-long, genetic blood disorder.

132.    Factor-five Leiden puts Carbo at 8-9 times higher risk of blood clots than the general public,

133.    Contracting Covid-19 has shown to increase the risk of blood clotting, and severe illness and death from such clotting,

134.    Carbo's condition puts her at much higher risk than the general public should she contract Covid-19,

135.    Carbo has medical certification that Factor V puts her at higher risk is she were to contact COVID-19

136.     Carbo has medical certification recommending she work from home during the spread of COVID due to the heightened risk of her Factor V blood condition.

**Plaintiff was otherwise qualified for the position of Family Development Manager**

137.     Prior to her request for accommodation, Carbo had a spotless work record with SUHS

138.     Carbo had been promoted twice by SUHS, once from intern to family development specialist, and then again to family development manager

139.     Carbo received outstanding performance appraisals

140.     Carbo more than adequately carried out all of the requirements of her job as family development manager.

**Defendant had notice of Carbo's disabilities and Carbo made a clear request for accommodations**

141.     Carbo provided medical certification on at least three occasions and informed SUHS, SU, Butts, Jirard, Browder, Petit, Hill, and Wonders of her disabilities,

142.     Carbo on three occasions provided Shippensburg University with medical documentation of two separate ADA covered disabilities.

143.    On or about July 15th, Carbo expressed her concerns about COVID,

her anxiety and her other underlying medical condition – Factor V Leiden,

to her supervisor, Butts

144.    Butts responded to Carbo's concerns indicating they we would talk

on the following Monday,

145.    On or about July 21, 2020, Carbo visited her family physician.

146.    Carbo's physician, Dr. Paladi, informed Carbo that her concerns were

legitimate and Carbo should not be working in an office environment

during the pandemic.

147.    Carbo's personal physician, Dr. Paladi, ordered a doctor's note to be

written based on her opinion.

148.    Dr. Piladi's CMA completed such note

149.    Carbo submitted this note to her immediate supervisor, Butts on or

about July 22, 2020

150.    The note indicated Carbo suffered from generalized anxiety disorder

along with other comorbidities that all qualified as disabilities under the

ADA, Rehabilitation Act and that as a result of these Carbo should work

remotely from home.

151.    Carbo provided Shippensburg University with documentation of her anxiety disorder, that put her at greater risk of psychological harm as a result of potential exposure to the COVID-19 virus

152.    This doctor's note as well as the other two Carbo submitted were each independently sufficient to meet the medical certification under the ADA, Rehabilitation Act, and PHRA,

153.    Carbo's doctor's notes each met every element of the Shippensburg specific Health Care Provider Questionnaire.

154.    Butts replied that she would review the documentation the next day after Carbo submitted her first medical certification.

155.    Despite the fact that this medical certification came from a health care provider, Shippensburg University rejected the first medical certification, because it came from the CMA in Dr. Paladi's office.

156.    Such documentation is a common practice in medical offices, and. Carbo's documentation was sufficient to demonstrate her disability and came from a medical professional as defined by the ADA.

157.    SU Human Resources informed, Carbo, that they did not and would not have denied such a letter, even though later they did exactly that.

158.     Carbo did obtain additional documentation of her disability signed

directly by her doctor and submitted such documentation to Shippensburg

University.

159.     Carbo provided Shippensburg with a third medical documentation of

her specific underlying comorbidity of Factor-V Leiden.

160.     The third medical certification clarified that this blood disorder, made

Carbo much more likely to suffer a blood clot than the general public.

Clearly this effects Ms. Carbo's circulatory and cardiovascular systems.

161.     Given the clotting issues for many patients with Covid-19, this was

particularly a concern as documented in Carbo's medical certification.

162.     However, once again, despite receiving clear documentation of

Carbo's disability (anxiety and other underlying comorbidities, including

FVL) AND the recommended accommodation from Ms. Carbo's doctor

(continued telework), more than sufficient information as defined under

the ADA, Shippensburg University again rejected Carbo's documentation

163.     Shippensburg University then decided that Carbo would have to get

her doctor to fill out a specific multi-page form.

164. Job Accommodation Network and the EEOC both are clear that employers during the pandemic should not continue to require employees to visit their doctors for further documentation.

165. Despite this, SUHS and SU decided that Carbo should visit her doctor for a fourth time, to obtain further documentation,

166. In response to the rejection of her medical certifications, Carbo asked on several occasions what specific additional information, SU and SUHS required,

167. SU never replied to Carbo's question.

168. Under the ADA, and Section 504 of the Rehabilitation Act, employers cannot require that medical certification be provided on specific forms, they may only require that sufficient medical information be provided.

169. Shippensburg University later admitted that Carbo's anxiety is a disability under the ADA and Rehabilitation Act,

170. SU/SUHS inexplicably denied that a blood clotting disorder which clearly impacts the vascular and cardio-pulmonary system is a disability.

171. The increased risk of clotting, severe health outcomes, and death from COVID due to this blood condition clearly falls within the definition of a disability under the ADA, Rehabilitation Act, and PA Human Relations Act.

**The conditions at SUHS place of business put Ms. Carbo at great risk of contracting COVID-19 and her underlying conditions of anxiety and Factor Five Leiden, made these conditions specifically dangerous for Ms. Carbo. The accommodation, SU claimed to offer of a private "office" was not effective as it did nothing to mitigate this risk.**

172.    On or about July 17, 2020, Butts sent out an email informing that

"each office" in our office building could decide on their own whether to

wear masks, as long as they were "social distancing."

173.    Workers in SUHS were stationed at desks no more than 2-3 feet from

each other.

174.    Common areas, copiers, restrooms, were shared by all SUHS workers.

175.    Workers at SUHS were not wearing masks in common areas.

176.    Common areas were not being cleaned on a regular basis.

177.    Butts had SUHS workers, working face to face at the Shippensburg

University Spiritual Center despite the campus, including the Spiritual

Center being closed.

178.    Due to the campus being closed the SU Spiritual Center was not

receiving janitorial service, heightening the risk of spread of COVID.

179.    The owner of the Shippensburg University Spiritual Center, the SU

Foundation, had no idea that SUHS continued to operate face to face in the

Spiritual Center while the campus was closed.

180. The ventilation in the SU Spiritual Center was clearly shared amongst all workers in the Spiritual Center

181. SUHS workers were never informed of the conditions or filtration of AC and ventilation at the Spiritual Center.

182. The fact that SU foundation was unaware of the presence of face-to-face work at the Spiritual Center, made it impossible for daily measure to be taken to clean the air and up the external air flow into the Spiritual Center.

183. The private office, offered to Carbo by Butts, shared all of these common features of the Spiritual Center.

184. The private office offered to Carbo by Butts had no external ventilation.

185. Butts took every conceivable measure to force SUHS workers to work face-to-face, despite the clear evidence of the danger this created.

   (A) She continued face-to-face after SU closed all buildings.

   (B) She claimed telework would be unfair to teachers who might be face-to-face if their school buildings were open, yet

   (C) She ordered SU campus SUHS workers face-to-face even while SUHS teachers were working virtually when K12 schools were closed.

(D) She ignored numerous executive orders from the Governor regarding

limiting face-to-face work, prohibiting face-to-face work for non-

direct educational staff, masking when face-to-face.

(E) She attempted to deny the right of access to FFCRA leave to all SUHS

employees.

**Plaintiff Requested an accommodation**

186.     Carbo requested an accommodation in every conceivable way

possible.

187.     Carbo specifically asked for an accommodation as required under the

ADA, Rehabilitation Act, and PHRA

188.     On numerous occasions, Carbo requested an accommodation and

the participation in the interactive accommodation process to her

supervisor Butts, to Ship U HR Browder, and Petit, to Ship U Social Equity

Jirard, to Nicole Hill, and to Chris Wonders

189.     Carbo requested a reasonable accommodation that met her doctor's

suggested accommodations

190.     Carbo requested on numerous occasions for the Ship U Head Start to

engage in the interactive process

191.     Despite these requests, SU/SUHS never engaged in the interactive

process, and refused to provide any reasonable accommodation to Ms.

Carbo

192.     Carbo offered several alternatives to full time telework, including

part-time work, different locations/schedules for meetings, and meeting

face-to-face on an as needed basis.

193.     SU/SUHS never replied to any of these additional options for

accommodation.

194.     SU/SUHS even refused a request for unpaid leave as an

accommodation, despite a history of providing unpaid leave to workers for

a multitude of various reasons.

195.     SUHS stated that they would not grant any leaves to anybody during

COVID, rather than looking at each request on a case-by-case basis, in a

clear violation of the ADA

**With a reasonable accommodation, Plaintiff could perform the essential
functions of the position.**

196.     For purposes of ADA or Rehabilitation Act, a reasonable

accommodation is one that is feasible or plausible. Rehabilitation Act of

1973 § 501, 29 U.S.C.A. § 791; Americans with Disabilities Act of 1990 §

101, 42 U.S.C.A. § 12111.

197.     In deciding whether a genuine issue of material fact exists regarding

the reasonableness of requested accommodation, so as to preclude

summary judgment in an employee's disability discrimination case, the

plaintiff must first make a facial showing that her proposed accommodation

is possible; if the plaintiff satisfies this burden of production, the employer

must prove, as an affirmative defense, that the requested accommodations

are unreasonable, or would cause undue hardship on the employer.

Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; Americans

with Disabilities Act of 1990, § 102(b)(5)(a), 42 U.S.C.A. § 12112(b)(5)(a).

198.     The term "reasonable" has two components in Rehabilitation Act

disability accommodation context: (1) efficacious and (2) proportional to

costs. Rehabilitation Act of 1973, § 504(d), 29 U.S.C.A. § 794(d).

199.     Telework is certainly contemplated as a viable accommodation under

Rehabilitation Act or ADA in certain circumstances. Rehabilitation Act of

1973 § 501, 29 U.S.C.A. § 791;Americans with Disabilities Act of 1990 § 101,

42 U.S.C.A. § 12111

200.    the plaintiff does not have the burden of establishing the

reasonableness of the accommodation, rather the defendant must prove

such an accommodation would create an undue hardship.  As discussed

below the defendant has failed to show such an undue hardship.

(Phoenixville-add cite)

## Carbo demonstrated that her requested accommodation of telework/modified telework was possible.

201.    Telework had proven to be effective in completing the work tasks of

the Family Development Manager and there were no increased costs of

providing such an accommodation.

202.    This position was performed via telework successfully during the

Spring and Summer of 2020

203.    Ms. Carbo fulfilled this position via telework and did so more

successfully than others in the same position at other Head Start programs

in the area

204.    Telework, when fully mandated and implemented was at least as

successful for the SUHS as other head starts in the area.

205.    On  or about July 29, 2020, Carbo received an email from Preschool

Program Specialist from PA Keys, the statewide organization that has

authority over the SUHS Pre-K program.  In an email exchange with Carbo,

Ms. Fareleman indicated, Carbo and her staff were doing everything we

could and at that time while working via telework.

206.    SU granted many faculty members and possibly staff the

accommodation of telework on their campus.  There was no remarkable

difference between these jobs and the family development manager in

terms of needing face-to-face contact.

207.    Butts suggested that granting telework as an accommodation to

Carbo would hurt the morale of other workers.  Morale of co-workers is

explicitly excluded as a basis for showing an undue hardship under the ADA.

208.     Ms. Girard's Office of Equity, Diversity and Inclusion which is tasked

with investigating claims of sexual misconduct and other claims has been

working virtually, as per the Governor's orders. This office deals with

emergencies on a much more regular basis than the Family Development

Manager position at SUHS does (and confidential information).

209.    National HS was indeed pushing for telework, when Ott and Butts

pushing for face-to-face

210.    The family development manager at other local head start

organizations worked via telecommuting during the COVID-19 Pandemic

211.     Ms. Carbo was also open to other possible accommodations, and

only rejected the accommodation of working from an observation closet

that did not address her physician's concerns.

212.     Carbo was receptive to and even offered alternative

accommodations, but SU/SUHS never engaged in a discussion of any of

these possible accommodations.

213.     Carbo proposed accommodations ranging from part-time telework

and face-to-face work when needed and even offered leave as an

accommodation,

## SU/SUHS failed to make a good faith effort in assisting Carbo in seeking an accommodation

214.     SU/SUHS never engaged in the interactive process to explore these

possibilities

215.     SU/SUHS never discussed and reviewed the essential functions of

Carbo's job to determine what tasks could be completed remotely/via

telework as suggested by EEOC pandemic and telework guidance,

216.     SU dismissed any possibility of leave, under a carte blanche policy of

not providing leave to anybody during the pandemic,

217.    SUHS had granted Leave, even open-ended had been given to numerous SUHS workers in the past for non-ADA reasons, yet completely refused to even consider in context of ADA and COVID

218.    SU/SUHS violated the ADA and Rehabilitation Act, by refusing to look at each request independently and instead applying this new blanket policy to ALL requests for leave

219.    Defendant claims offering for plaintiff to work in an observation room was a reasonable accommodation.

220.    The offer to work from an observation room was not a reasonable accommodation.

221.    This offer did not address any of Carbo's concerns, nor the concerns of her doctor.

222.    This offer was made at a time, when the University had decided that the only safe route was to close ALL University buildings.

223.    This offer of working this observation room did nothing to address the concerns of common areas, the lack of masking by SUHS employees, the lack of ventilation, or the lack of adequate cleaning to prevent the spread of COVID

224.    Working from this observation room would have increased the risks for Carbo, as the area in question was not cleaned as the University Foundation who owned such facility had closed the building and was not providing janitorial services

225.    SU/SUHS refused to accept three different medical certifications of her disability and need for accommodation, yet refused to answer Carbo's question about what additional information they needed.

**SU/SUHS Policy was unlawful as a matter of law**

226.    The application of full duty work rules to a qualified person with a disability are antithetical to the statutory requirement that covered employers engage in an individualized, interactive process and provide reasonable accommodations that allow the employee to perform the essential functions of the job he holds or desires, with or without accommodation. 42 U.S.C. §12112 (b)(3)(A).

227.    The imposition of a full-duty standard to prevent Carbo from returning to work with reasonable accommodations, and then even denying her unpaid leave constitutes discrimination as a matter of law under Section 504 and the ADAA.

228.    The requirement demanding Carbo complete a specific form, rather than simply providing sufficient information as to her disability and the need for accommodation, constitutes discrimination as a matter of law under Section 504 and the ADAA.

229.    SU/SUHS failed to show that telework or the any of the other proffered accommodations would create an undue hardship

230.    From the time Carbo requested telework as an accommodation, the SU/SUHS never gave any reasons why this created an undue hardship,

231.    At one point, Butts pointed to the morale of other employees. However, this is per se an invalid reason for denying an accommodation under the ADA and Rehabilitation Act.

232.    Butts also mentioned dealing with emergencies at one point. On or about July 24, 2020, Butts informed Carbo that she decided to supply Carbo with a private office, but to require Carbo to work face to face with the reasoning that I would need to be on site to deal with emergencies

233.    In Carbo's four years she had never experienced an emergency that needed her to be face-to-face in the SU Spiritual Center

234.    Despite this Carbo indicated she would be willing to come in if such

emergency occurred, as long as it was dealt with under sufficient masking

and social distancing,

235.    Many faculty members and possibly staff were granted

accommodations to engage in telework with simple email statements

concerning their conditions or the underlying conditions of others in their

households

236.    SU/SUHS now claims that the accommodation created an undue

hardship because it exposed private information to others in Carbo's

household,

237.    SU/SUHS never brought this concern to Carbo's attention until after

they had terminated Carbo's employment.

238.    Such concern could have easily been addressed by the use of a

headset during Zoom conversations.

239.    Further, Carbo conducted all Zoom sessions where private

information was conducted in a private room of her home away from all

other residents,

240.     Numerous SU jobs sharing private, confidential information were

being conducted via telework and Zoom, Teams, or other apps, including

Social Equity and HR.

241.     Similarly, other jobs with confidential information were being

conducted via telework across the state and country.  These positions

included both the PRHC agents, DOL agents, and EEOC agents Ms. Carbo

spoke with throughout this process.

242.     These positions also included faculty and staff positions at SU.

243.     These positions included both HR and Social Equity positions at SU,

where much of the information discussed is clearly confidential.

244.     Other area head start programs indicated that SUHS, and in

particular Ms. Carbo were doing quite well in filling their classes and

carrying out the programmatic goals via telework during the early parts of

the COVID-19 pandemic.

245.     Per Carbo's conversations with other head starts we were actually

doing very well in terms of our recruiting.

246.     SUHS never informed Ms. Carbo which of her job duties could not be

completed via telework or via the other accommodations she had offered.

**SUHS not only failed to provide a reasonable accommodation to Ms. Carbo, they refused to engage in the interactive process in good faith.**

247.     To show that an employer failed to participate in the interactive process of finding reasonable accommodations under the Americans with Disabilities Act (ADA), a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Americans with Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. § 12112(b)(5)(A).

248.     The ADA imposes upon employers a good-faith duty to engage with their employees in an interactive process to identify a reasonable accommodation, which is triggered when an employee communicates her disability and desire for an accommodation, even if the employee fails to identify a specific, reasonable accommodation; however, an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the essential functions of

the position. Americans with Disabilities Act of 1990 § 101 et seq., 42

U.S.C.A. § 12111 et seq.

249.     An employee's request for reasonable accommodation under the

Americans with Disabilities Act (ADA) requires a great deal of

communication between the employee and employer; both parties bear

responsibility for determining what accommodation is necessary, and a

party that obstructs or delays the interactive process is not acting in good

faith, and a party that fails to communicate, by way of initiation or

response, may also be acting in bad faith. Americans with Disabilities Act of

1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; 29 C.F.R. Part 1630 App., §§

1630.2(o)(3), 1630.9. (Taylor v. Phoenixville Areas SD)

250.     Once the employer knows of employee's disability and the

employee's desire for accommodations, burden is on the employer under

the Americans with Disabilities Act (ADA) to request additional information

that the employer believes it needs, especially in cases of mental illness.

Americans with Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. §

12112(b)(5)(A) (Taylor v. Phoenixville)

251.     An employer who has received proper notice of a request for

accommodation under the Americans with Disabilities Act (ADA) cannot

escape its duty to engage in the interactive process simply because the

employee did not come forward with a reasonable accommodation that

would prevail in litigation, but an employer cannot be faulted if, after

conferring with the employee to find possible accommodations, the

employee then fails to supply information that the employer needs or does

not answer the employer's request for more detailed proposals. Americans

with Disabilities Act of 1990, § 102(b)(5)(A), 42 U.S.C.A. §

12112(b)(5)(A).(Taylor v. Phoenixville)

252.    Carbo informed her supervisor, SU's HR department, SU's social

equity department and other members of SU administration of her need

for an accommodation.

253.    Despite this, SU/SUHS never engaged in any level of interactive

process.

254.    Carbo specifically requested that SU/SUHS engage in such an

interactive process, and again SU failed to do so.

255.    Carbo asked for the specific additional information that SU needed

from her to begin the interactive process, and SU never answered Carbo's

questions

256.     SU/SUHS never reviewed the essential functions of Ms. Carbo's job to determine which could or could not be completed via telework.

257.     SU/SUHS never engaged in reviewing the various alternative accommodations Carbo offered.

258.     On or about August 19, 2020, Butts sent an email that on August 24, 2020 ALL telework would end with the exception of school staff and closures.

259.     Carbo supplied sufficient medical documentation of her disabilities and her need for an accommodation on at least three occasions to SU and SUHS, yet SU and SUHS still never engage in the interactive process.

260.     SUHS did not engage in the interactive process in good faith, rather they never had any intent to make accommodations for COVID-19.

261.     We never sat down to work through the 70+ job duties listed on my job description to determine which are essential and/or which could be completed via telework.

**SU's reasons for denying accommodation are not legitimate business reasons, but instead are pretext to cover up the discrimination based on Ms. Carbo's disability**

262.     To demonstrate that these reasons are pretextual, Plaintiff must point to "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Olson, 101 F.3d at 951 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

263.     To discredit the employer's explanation, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.' " Fuentes, 32 F.3d at 765 (internal citation omitted) (emphasis in original) (alteration in original).4

264.     From the beginning of the COVID-19 pandemic, Butts and SUHS demonstrated that they did not take the pandemic seriously and demonstrated animus towards anyone who did.

265.     On numerous occasions Butts violated Governor Wolf's orders, CDC guidance, Shippensburg University directives concerning COVID-19

266.     Butts allowed staff to decide whether or not to wear masks, when government orders required masking

267.     Butts allowed Ott and other to travel to quarantine states and then to return to the office without quarantining in direct violation of Governor Wolf's orders,

268.     Butts attempted to deny the right to FFCRA to all SUHS staff members, claiming they had used such leave while working.

269.     Butts forced SUHS workers to work in an office building that was not receiving janitorial service and lied about the conditions of such building to Carbo in order to convince her to return to work face-to-face.

270.     SUHS never discussed concerns with privacy with Carbo, rather they added this as their excuse for not accommodating Carbo only towards the end of the PHRC investigatory process,

271.     SUHS never engaged with Carbo to look at other potential accommodations despite Carbo's repeated requests to do so,

272.     SUHS denied leave to Carbo, under what they deemed to be a carte

blanche policy, after having granted leave on a regular basis to employees

for a variety of reasons during Carbo's tenure with SUHS,

273.     SUHS and SU refused to inform Carbo of what specific information

they needed from Carbo's medical provider

274.     SU utilized non-relevant CFR's to excuse their denial of Carbo's

accommodation and even truncated these CFRs to exclude parts that were

not favorable to their determination.


**B.     Claim 2: Retaliation for engaging in protected activity under the ADA/ADAA and Rehabilitation Act**

275.     The allegations set forth in Paragraphs 1-275 are re-alleged and

incorporated by reference herein

276.     Section 504 and the ADA/ADAA forbid discrimination against any

person because he has complained of or opposed any act or practice made

unlawful by the Act, or participated in any manner in a proceeding related

to the discrimination it prohibits. 42 U.S.C. §12203(a).

277.     Section 504 and the ADA/ADAA also forbid coercing, intimidating,

threatening, or interfering with an individual in the exercise or enjoyment

of, or on account of his or her having exercised or enjoyed, the protections
of the Act. 42 U.S.C. §12203(b).

278.     Carbo engaged in protected activity under the Act, including, but not
limited to, requesting reasonable accommodations, opposing SUHS's
refusal to provide her with accommodations to which she held a good faith
belief to entitlement, and her protesting the denial of these rights to her
staff and co-workers at SUHS,

279.     SU and SUHS were aware of Carbo's protected activity, and took
adverse actions against her because of it by, inter a/ia, a) denying her
reasonable accommodations to which she was entitled, b) refusing to allow
her to return to work at all unless he could do so without accommodations,

c)       refusing to conduct an interactive process or otherwise complying
with his legitimate requests for accommodation, and other statutory rights
and benefits under the Act.

d)       Terminating Carbo's employment with SUHS.

280.     In addition to the actions stated in the preceding paragraph, SU and
SUHS  interfered with Carbo's statutory rights by misrepresenting the legal
standards for evaluating her entitlement to reasonable accommodation,
denying accommodations based on an erroneous standard, imposing

policies and requirements purporting to limit her right to invoke her statutory protections, including a fixed no-accommodation, no-exceptions and full-time, full-duty requirements, and threatening to terminate her employment.

281.    SU and SUHS's actions against Carbo are materially adverse and have caused her to suffer distinct and palpable injuries, including the deprivation of her right to equal employment opportunity and the emoluments thereof, including, inter alia, salary, leave accruals, and pension service credit, as well as emotional stress and existential anxiety.

282.    SUHS's treatment of Carbo would be perceived as so materially adverse, threatening, and intimidating to any reasonable employee that they likely would be dissuaded from asserting their rights, much less opposing or reporting violations of Section 504's requirements, thereby interfering with the implementation of the Act itself and undermining its statutory purposes.

WHEREFORE,  Ms. Carbo  respectfully prays for the following relief:

(1) A declaratory judgment that SU/SUHS's refusal to provide her with reasonable accommodations constitutes discrimination against her on the basis of her disability under Section 504 and the ADA/ADAA,

(2) An injunction ordering SU/SUHS to return Carbo to full-duty status and to restore all of the emoluments of employment to which she would have been entitled had it not been for their illegal actions, including, but not limited to full back pay, and as well as interest, vacation, holiday, and sick accruals.

(3) Compensatory damages for the financial losses, emotional distress, and other compensatory losses she sustained as a result of SU/SUHS' illegal actions.

(4) Award Plaintiff and her counsel all costs and attorneys' fees she has incurred or will incur in the prosecution of this action.

(5) Given the egregious nature of SU/SUHS' failure to accommodate and engage in their obligations of under

the ADA and Rehabilitation Act, and their intentional
deception concerning Carbo's rights under such acts,
Carbo requests punitive damages be assessed as the
Court deems reasonable to assure SU/SUHS refrains
from these practices in the future.

(6) Award all other relief which may be just and proper
under the circumstances.

Respectfully submitted,

Betty A. Carbo, Plaintiff

614 Eric Drive

Shippensburg, PA 17257

(304)629-0786